IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF RYDER K. & PARKER K.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF RYDER K. & PARKER K., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

LATESHA K., APPELLANT.

Filed May 12, 2026.   Nos. A-25-704, A-25-705.

Appeals from the County Court for Hall County: ALFRED E. COREY III, Judge. Affirmed.

John D. Icenogle, of Bruner Frank Schumacher Husak, L.L.C., for appellant.

Anna M. Brokaw, Hall County Deputy County Attorney, for appellee.

MOORE, PIRTLE, and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

Latesha K. appeals from two separate orders of the Hall County Court sitting as a juvenile court, terminating her parental rights to two of her children. We have consolidated the juvenile cases and upon our de novo review of the record, we affirm the juvenile court's orders.

## II. STATEMENT OF FACTS

Latesha is the mother of Ryder K., born in August 2020; and Parker K., born in November 2022. Latesha has additional children who are not at issue in this appeal. Paxton, born in September 2021, was removed with Parker, and Braxton was born during the pendency of this juvenile case in July 2024. Ryder and Parker have different fathers. Though the fathers' parental rights were also terminated, they are not parties to this appeal and will be discussed only as necessary to the resolution of the current appeal by Latesha.

- 1 -

## 1. PROCEDURAL HISTORY

Ryder was removed from Latesha's care in March 2023 after he was hospitalized due to symptoms relating to his childhood nephrotic syndrome. A petition was filed on March 29 to adjudicate Ryder pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The petition alleged that Ryder had been diagnosed with nephrotic syndrome, which requires him to receive specific care to keep the condition in remission and prevent serious medical complications. The petition alleged that despite education and training opportunities, Latesha had not been able to clearly state the importance of his care and dietary restrictions, denied the importance of that care, and failed to follow the prescribed treatment. Latesha had also allegedly failed to properly administer Ryder's necessary medication during his recent hospitalization.

Parker was removed from Latesha's care in July 2023 following a report that Latesha and her children were living in unsanitary conditions. A petition was filed on July 13 to adjudicate Parker and Paxton, pursuant to § 43-247(3)(a). The petition alleged that Department of Health and Human Services (the Department) caseworker Angela Brown had recently made an unannounced home visit to a hotel room that Latesha and her children were staying in. The petition alleged that Brown noted a pungent odor coming from the room and that the floor was littered with refuse. The petition alleged that it was challenging to walk around the hotel room due to the amount of excess trash and clothing on the floor, some of which appeared to have insects or feces in it. Latesha claimed to have bathed both Parker and Paxton recently, but Parker allegedly had dirt and crusted milk on his neck, which had caused a rash, and open sores due to a severe diaper rash. Paxton allegedly had matted hair and dirt all over his body. The petition alleged that the housing conditions were unsuitable for children, particularly for the ages of Parker and Paxton.

Ryder was adjudicated in May 2023 and Parker in September. Ryder and Parker have not returned to Latesha's care since they were removed. Paxton was later placed with his father during the juvenile case. At the time of the termination trial, Paxton's father and the Department were working on a parenting plan with the goal of an eventual bridge order.

The juvenile court entered a dispositional plan as to Ryder on June 9, 2023, and as to Parker on September 14. In both instances, the court adopted the case plan presented by the Department. These case plans are not included in our record on appeal. Several review hearings were held, as to Ryder on September 14, 2023; and as to both children on December 14; February 15, 2024; June 13; October 24; January 15, 2025; April 17; July 17; and August 21.

On March 28, 2025, the State filed motions to terminate Latesha's parental rights to Ryder and Parker. The State alleged grounds for termination under Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) and that termination of Latesha's parental rights was in the children's best interests.

## 2. TRIAL

A termination trial was held over 2 days in August 2025.

### (a) Removal and Case Plan

Brown testified that she had been the family's caseworker since April 2023. Brown testified consistently with the adjudication petitions regarding the circumstances of the children's removals.

Brown testified that Ryder has childhood nephrotic syndrome, which requires a rigid diet involving a limited amount of sodium and liquid. If Ryder has excess amounts of sodium or liquid, it can cause him to "relapse." During a relapse, Ryder must be hospitalized as he experiences inflammation and swelling throughout his body, which puts stress on his heart and can increase his cholesterol. Ryder was hospitalized in March 2023 due to one of these relapses. Latesha testified that she was unaware of Ryder's condition and that he was diagnosed with childhood nephrotic syndrome during this hospitalization.

Brown testified that caregivers for Ryder are required to take specific training to attend to his condition. These trainings include learning about his medication regimen and how to properly measure foods and read nutritional guides. When Ryder was in the hospital in March 2023, Latesha was offered the opportunity to learn how to administer his medications. Hospital staff reported to Brown that Latesha did not successfully complete the training. Additionally, before Ryder could be discharged, hospital staff required that a caregiver spend 24 hours with Ryder to demonstrate that they could appropriately care for Ryder during that period. Brown testified that Latesha had to return to work and could not stay during the full period required. Ryder was removed from Latesha's care during his hospitalization and was discharged to his first placement.

Parker was later removed from Latesha's care due to the unsanitary condition of the hotel room he was living in with Latesha, his father, Corey W., and his sibling, Paxton.

Brown testified that the primary goal of Latesha's case plan was to ensure the safety and well-being of Ryder and Parker by demonstrating that Latesha could provide for the children's physical, emotional, and educational needs. Brown described the various strategies to achieve that goal, including finding and maintaining employment, ensuring the children were enrolled in educational services, setting up and attending medical appointments, finding stable housing, participating in parenting time visits, and participating in family support.

### (b) Housing

Brown testified that stable housing is important for parents because it provides a sense of continuity and allows the parents to focus on meeting the needs of their children. Parents must demonstrate to the Department that they can maintain their current housing by paying rent and utilities. After Latesha moved out of the hotel room, she did not have a stable address and lived with various family members and friends. Latesha testified that she lived in a camper during this time.

In April 2024, Latesha moved into an apartment directly behind her aunt and uncle's home with her grandmother, Judy M. Parker was placed with this aunt and uncle immediately after his removal and Ryder joined the placement in November 2024. Brown testified that Latesha remained in the apartment until a few months prior to trial. Judy was the only person listed as a tenant on

the lease when Latesha moved into the apartment, and Latesha was listed as a guest. Brown believed that Latesha took over the lease when Judy moved out in March 2025.

Brown testified that there were times when the apartment was fine and Brown had no concerns. However, there were also times when Brown would observe the apartment to be very cluttered and find it difficult to move around in. At trial, Latesha attributed the clutter to Judy having many possessions.

Brown also testified to her concerns regarding a cockroach infestation in the apartment. At the time, Latesha was having visitation with the children in the apartment. Visits had to be temporarily moved to a visitation center due to concerns regarding the infestation. Brown testified that Latesha handled the issue well with her landlord. Latesha again attributed the infestation to Judy's clutter. The apartment was fumigated, though the cockroaches eventually returned to the apartment. Latesha testified that at that point she decided to move out of the apartment. Brown testified that Latesha had told her in June 2025 that she was $2,000 behind in her rent payments and was concerned that she may be evicted from the apartment.

Latesha testified that she was presently living in a rental home with her boyfriend, who she had begun dating a month prior. Latesha had been living in the home for 2 weeks at the time of trial. Latesha testified that she was not on the home's lease but "as far as I know I am pretty sure I have a good chance at getting on that lease. And if not, then we start looking for another place to live."

(c) Visitation

At the beginning of the case, Latesha had three visits a week with Parker, Paxton, and Ryder. Brown testified that Latesha initially managed visits with all three children at the same time, but she struggled handling interactions between Ryder and Paxton, who fought frequently.

At the beginning of the case, Latesha and Codey, Parker's father, shared some of their visits. Tami Gangwish, the chief executive officer of the visitation company that supervised Latesha's visits, testified that there were times when Latesha had to direct Codey on what to do, and there were times when Latesha placed more responsibility on Codey than Latesha was willing to take on herself. There were also concerns that Latesha and Codey were getting into altercations or disputes in front of the children during visits. Latesha and Codey stopped sharing any visits when their romantic relationship ended in January 2025.

After Latesha moved into the apartment in April 2024, she had supervised visits with Ryder and Parker in her home. During this time, Latesha's visitation was increased to 20 hours a week due to her progress in the case. Brown testified that while Latesha was living with Judy in the apartment, she sometimes relied on Judy to provide childcare during visits. There were times when Latesha was appropriate with Judy, but there were times when Latesha would make demands, get angry, or be disrespectful toward her. Latesha had reached out to Brown to schedule a walk-through of her current rental home, but that had not yet occurred at the time of trial.

Latesha's participation in visitation has been inconsistent during the case. Gangwish testified that Latesha had a history of canceling visits at the last minute or ending visits early. Gangwish testified that Latesha could do well at visits but other times she struggled to manage the children's behaviors. The success of the visit depended on the behaviors of the children and if Latesha was feeling physically well. When the children acted up, Latesha could become anxious,

which made it harder for her to manage the children. Visitation workers addressed Latesha's anxiety with her, and Gangwish stated "there [are] days that I think she has shown great strength in that area, and then there [are] other days that I think she continues to struggle."

Latesha also worked with visitation workers to manage the children's behavior. When Latesha was redirected by Gangwish's visitation workers, sometimes she was open to the feedback but other times she would get defensive, argumentative, and angry. Gangwish was contacted due to a worker's concerns about Latesha's behavior during visits more than ten times during the case, and some visits ended early due to the safety concerns caused by Latesha's behavior or outbursts. One visit in February 2025 ended early after Latesha refused to change Paxton after he had urinated in his pants because she said she would not get the clothing back from his placement.

Latesha's engagement with the children at visits had also been inconsistent. Gangwish testified that there had been instances where Latesha's children tried to get her attention and Latesha would not engage, ask them to entertain themselves, or be on her phone. These instances had become more frequent in the months preceding trial. When asked whether she was always engaged with her children during visits Latesha stated, "There are times where I didn't, but there are also times that I did. And the times that I did are more than the times that I did not."

Latesha was generally prepared for visits. Latesha had done well measuring and preparing food appropriate for Ryder's dietary restrictions for all the children to share over the last 6 to 12 months. On occasion Latesha had to borrow something from the visitation center because she had forgotten an item for a visit or did not have the financial resources to provide the item.

Gangwish believes that Ryder loves Latesha, but there are times that he has asked to go home or has asked to leave a visit with Latesha. Ryder has indicated at least three times that he fears Latesha. Gangwish thought Ryder was afraid of Letesha when she raised her voice around the children. Parker has gone to Gangwish or other visitation workers at times when Latesha is agitated. It appeared to Gangwish that Parker was seeking to be comforted by an adult other than Latesha. Brown noted that Latesha had been more consistently yelling at the children at visits for the last 3 to 4 months.

In June 2025, Braxton, Latesha's youngest child, was life-flighted to a children's hospital after he swallowed a button battery. Braxton was not in Latesha's care when this incident occurred. Immediately after that event, Latesha did not have visits with Ryder and Parker in order to stay with Braxton at the hospital. After Braxton was stabilized, the Department began offering visits to Latesha again, as well as gas vouchers to accommodate her travel. Latesha had attended some visits with Ryder and Parker since Braxton's hospitalization, but her visits have not been consistent.

Latesha has not progressed to semi-supervised or unsupervised visits at any point during the case. Brown testified that because Latesha could not get to a point where she could handle 20 hours successfully, the Department had no plan to decrease Latesha's level of supervision. In Brown's experience, it was not typical for a juvenile case to have been open for over 2 years and still have fully supervised visits. The last period of success that Brown saw Latesha have with her visits ended in January 2025, when Latesha and Codey also ended their relationship.

### (d) Children's Ongoing Needs

Brown testified that the Department has worked to keep Latesha informed of Ryder's follow-up medical appointments with specialists. Latesha has attended some of those appointments, as well as a training session with Ryder's dietician.

When Latesha moved into the apartment in April 2024, she was within walking distance of Ryder's placement. Latesha was given opportunities to help with Ryder's medication, and Brown testified that there were some occasions when Latesha took advantage of that opportunity, but there were also times Latesha did not participate. There were times when Latesha was not available, and in one instance, she was not able to get to the placement in time to give him his medication because she was without transportation. Recently, Latesha has not been participating in the administration of Ryder's medication because Latesha does not have a good relationship with her aunt and Brown testified that it was not in Ryder or Parker's best interests to be subjected to their arguments.

Parker was developmentally delayed at the time he was removed from Latesha's care. Since that time, he has worked with speech, physical, and occupational therapists. Brown believed that he had been discharged from physical therapy but was participating in speech and occupational therapy weekly. Latesha initially took Parker to some of these appointments, but over the last few months, Parker's placement has taken him.

### (e) Employment and Offered Services

Brown testified that Latesha has been unemployed for the majority of the case. Latesha had previously worked at a liquor store and a fast-food restaurant. Latesha testified to two other brief periods of employment at Case New Holland and on a paper route. At the time of the termination trial, Latesha was not employed but was looking for a job.

During the case, Latesha was discharged from Aid to Dependent Children after she did not meet the requirements that she demonstrate she was applying for jobs or participating in volunteer work. Brown testified that though family support attempted to help Latesha find employment, Latesha did not consistently engage with family support during the case. Gangwish testified consistently, noting that Latesha had not met with family support over the last several months but contacted Gangwish a week prior to the termination trial to schedule time with family support.

Brown had also suggested to Latesha that the Department could make a referral to Goodwill Services, which would help with housing, vocation rehabilitation, and employment opportunities. Brown needed documentation regarding Latesha's mental health diagnoses and treatment plan to qualify for the service. Latesha told Brown that she would acquire the documentation but ultimately decided that she did not want to work with Goodwill.

Brown testified that Latesha was provided with case management, family team meetings, transportation services, gas vouchers, in-home family support before Parker and Paxton were removed, rental assistance, vouchers for diapers and wipes, clothing, food benefits, and Medicaid. At times during the case, Latesha also worked with Early Development Network and Sixpence, which provide services to children under 3 years old with developmental delays. Latesha completed the Circle of Security and Love and Logic parenting classes. Brown testified that the Department had exhausted the services available to Latesha.

### (f) Mental Health

Brown testified that Latesha was ordered to undergo a psychological evaluation due to concerns regarding her mental health. The evaluation was completed in November 2023 and recommended individual therapy and couples counseling with Codey, supervised visits with her children, finding employment, and working with family support to build parenting skills. A copy of the evaluation is not included in our record on appeal. In an affidavit dated April 2025, Latesha stated that she takes prescribed medication to treat depression and anxiety. Latesha has consistently attended weekly individual therapy throughout the case, though occasionally her care lapsed when she had to switch providers. Brown did not believe that Latesha and Codey ever attended couples counseling before their relationship ended in January 2025.

### 3. ORDER

Following the termination trial, the juvenile court entered an order on September 11, 2025, terminating Latesha's rights to Ryder and Parker. The court found that the State had met its burden of proving substantial and continuous neglect, and that the children had been in out-of-home placement for 15 or more months out of the most recent 22 months pursuant to § 43-292(2) and (7). The court also found that pursuant to § 43-292(6), Latesha also failed to correct the conditions that led to the children being adjudicated under § 43-247(3)(a). The court further found that Latesha was an unfit parent and that it was in the best interests of the children to have Latesha's parental rights terminated.

Latesha appeals.

## III. ASSIGNMENTS OF ERROR

Latesha assigns, restated, that the juvenile court erred in (1) finding clear and convincing evidence to terminate her parental rights pursuant to § 43-292(7) and (2) finding that Latesha was an unfit parent and that termination of her parental rights was in the children's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jordon B.*, 316 Neb. 974, 7 N.W.3d 894 (2024). When the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023).

## V. ANALYSIS

### 1. STATUTORY GROUNDS

Latesha assigns that the juvenile court erred in finding clear and convincing evidence to terminate her parental rights pursuant to § 43-292(7).

Upon our de novo review, we find that the State presented clear and convincing evidence to support termination of Latesha's parental rights under § 43-292(7). Proof of one statutory ground is needed for termination, and the record clearly shows that statutory grounds for termination of her parental rights exist under § 43-292(7).

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Latesha acknowledges that the children have been in out-of-home placement for more than 15 months, but she nonetheless argues that the juvenile court erred in finding clear and convincing evidence to terminate her parental rights under § 43-292(7). In support of this argument, Latesha asserts that the fact a child has been placed outside the home for 15 or more of the most recent 22 months does not demonstrate parental unfitness, but, instead, merely provides a guideline for what would be a reasonable time for parents to rehabilitate themselves to a minimum degree of fitness. See *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

We agree that a child's placement outside the home for 15 or more of the most recent 22 months does not necessarily demonstrate parental unfitness. See *id.* Regardless of the length of time a child is placed outside the home, it is always the State's burden to prove by clear and convincing evidence that the parent is unfit and that the child's best interests are served by his or her continued removal from parental custody. *Id.* In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child. See *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). We have addressed Latesha's arguments with respect to parental unfitness and best interests below.

Ryder was removed from Latesha's care in March 2023, and Parker in July 2023. The children have been in out-of-home placement continuously since that time. At the time the termination motions were filed on March 28, 2025, Ryder had been in out-of-home care for 24 months and Parker for 20 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Latesha's parental rights under § 43-292(7) were proven by sufficient evidence.

The juvenile court also found sufficient evidence to support termination under § 43-292(2) and (6), but we do not need to consider whether termination of Latesha's parental rights was proper pursuant to those subsections since § 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). However, we will consider evidence relevant to § 43-292(2) and (6) in our analysis of best interests. Generally, when termination of parental rights is sought, the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re Interest of J'Endlessly F. et al.*, 26 Neb. App. 497, 920 N.W.2d 858 (2018).

### 2. BEST INTERESTS AND UNFITNESS

Latesha assigns that the juvenile court erred in finding that termination of her parental rights was in the children's best interests.

In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. See *In re Interest of Noah C., supra*. There is a rebuttable presumption that the best interests of a child are served by having a relationship with

his or her parent. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.* Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023).

Latesha argues that she had sufficiently accomplished all the goals set forth in her case plan. She contends that there were multiple periods during the case in which she was doing extremely well, including the 6 months leading up to the termination trial. Latesha notes that at the time of trial she was in a new home and there were no concerns from case professionals regarding her ability to attend to Ryder's medical condition. While it is clear that Latesha loves her children and at times exhibited positive parenting skills, we disagree that she satisfied all of the requirements of her case plan.

Latesha's housing was not consistent during the case. At the commencement of the case, she was living in a motel with her children that was deemed unsanitary. She moved into an apartment with her grandmother but had to leave this housing due to infestation issues and an inability to pay rent. Brown testified that the Department considers a parent's housing to be stable when the parent can demonstrate that they can maintain their current housing by paying rent and utilities. In June 2025, just 2 months before the termination trial, Latesha told Brown that she owed $2,000 in overdue rent and was concerned about being evicted from her apartment. At the time of trial, Latesha was living in a new rental home with a new boyfriend but was not listed on the lease and did not appear to have contributed financially to her housing.

Latesha's ability to financially contribute to the care of the children is limited due to her lack of consistent employment. Latesha briefly held four positions at various points of the case but was unemployed at the time of the termination trial. Though services were provided to help Latesha find employment, she was discharged from Aid to Dependent Children, did not meaningfully participate in family support, and decided she did not want to work with Goodwill, despite Brown offering to set up a referral.

Latesha struggled to both consistently attend visitation and consistently engage with her children while at visits. Gangwish testified that the quality of the visits largely depended on how Latesha was feeling and the behaviors of the children. Sometimes Latesha was open to redirection provided by the visitation workers, and other times she was hostile. At times, Latesha would become anxious and agitated, and yell at the children and visitation workers. Visitation workers had to call Gangwish with concerns regarding Latesha's behavior at visits more than ten times during the case. Some visits ended early due to safety concerns. Most concerning is that Latesha's outbursts and disengagement from her children appeared to be increasing in the months preceding the termination trial. Latesha has never progressed beyond supervised visitation.

When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights, and last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental

rights. See *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). Further, children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Cameron L. & David L., supra*. We conclude that the State showed clear and convincing evidence that Latesha was unfit, and that termination of her parental rights was in the children's best interests.

## VI. CONCLUSION

For the reasons stated above, we affirm the juvenile court's orders terminating Latesha's parental rights to Ryder and Parker.

AFFIRMED.